## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SARAH HEINZL, individually and on behalf of all others similarly situated,<br>　　　　　　　　Plaintiff, | )<br>)<br>)<br>) |  |
| vs | )<br>) | Civil Action No. 14-1455<br>Judge Hornak |
| CRACKER BARREL OLD COUNTRY STORES, INC.,<br>　　　　　　　　Defendant. | )<br>)<br>) | Magistrate Judge Mitchell |

I.　　Recommendation

It is respectfully recommended that the motion to certify class filed on behalf of the

plaintiff (ECF No. 103) be granted, as defined herein. It is further recommended that the motion

for summary judgment filed on behalf of the defendant (ECF No. 64) be denied.

II.　　Report

Plaintiff, Sarah Heinzl, brings this action individually and on behalf of all others similarly

situated against Defendant, Cracker Barrel Old County Stores, Inc. ("Cracker Barrel"), alleging

violations of Title III of the Americans With Disabilities Act, 42 U.S.C. §§ 12181 to 12189

(ADA). Specifically, she alleges that the facilities at Cracker Barrel are not fully accessible to

and independently usable by individuals who use wheelchairs for mobility, as she does, because

of various barriers in the parking lot and along the route to the building entrance. Moreover, she

contends that Cracker Barrel's company-wide ADA compliance policies and practices are

woefully inadequate to ensure that Cracker Barrel meets its legal obligation to provide facilities

accessible to persons, like her and the proposed class, who have mobility disabilities.

Presently before the Court are two motions. Plaintiff has filed a motion for class action

certification. Defendant has filed a motion for summary judgment, in which it contends that

Plaintiff's claims are moot because it has remediated the architectural barriers at the seven stores

identified in the Complaint. The motions have been fully briefed and a hearing was held on the class certification motion. For the reasons that follow, Plaintiff's motion should be granted and Defendant's motion should be denied.

Facts

Plaintiff is a twenty-six year old native of Pittsburgh, Pennsylvania who has a mobility disability and is limited in the major life activity of walking. (Compl. ¶ 2; Heinzl Dep. 7:2-6, 11:14-19.)[1] Due to a neuro-immunologic disease, she has been in a wheelchair for the past eleven years and, as a result of her disability, is a member of a protected class under the ADA. (Compl. ¶ 15; Heinzl Dep. 13:22-14:7.) Despite her disease, Plaintiff actively participates in athletic activities, travels frequently, and regularly drives her automobile by herself. (Heinzl Dep. 14:23-15:6, 21:18-22, 23:3-9.) She has worked as an outside contractor for the Three Rivers Center for Independent Living, and is currently pursuing a graduate degree at the University of Arizona. (Heinzl Dep. 16:13-17:13, 49:14-18; Heinzl Dep. II 6:3-8.[2])

Plaintiff has visited Defendant's retail property located at 200 Davis Boulevard, Pittsburgh, Pennsylvania on numerous occasions. (Compl. ¶ 18.) She estimates that she visits this location at least eight times per year, as this particular location is near a mall and other retail stores where she shops regularly. (Heinzl Dep. 23:10-14, 30:17-22.)[3] Moreover, she intends to continue patronizing this location in the future. (Heinzl Dep. 23:19-22.) She has also visited other Cracker Barrel stores. (Heinzl Dep. 23:4-9.)

During her visits to this location, Plaintiff experienced extreme difficulty in the purportedly accessible parking lot. As she described it at deposition: "I drive myself, and I am –

---

[1] ECF No. 1; Pl.'s App. (ECF No. 102) Vol. I, App. 1-60.
[2] ECF No. 102, Vol. VII, App. 1408-1435.
[3] Defendant "denies" this statement (ECF No. 107 ¶ 1), but provides no basis for its denial.

find it very important to be independent. [] I went to the store with my mother. And with my vehicle, I put my wheelchair right next to me, so that I can get it out myself. I can do everything by myself. [] At this location, I did so. And when I put my wheels on my chair and got it out of the car, it rolled away. And my mom had to race after it through a parking lot." (Heinzl Dep. 25:1-14.) Plaintiff explained that her wheelchair rolled away because she "parked in a handicapped spot that was not level." (Heinzl Dep. 36:3-22.)[4] Consequently, due to the risk of her wheelchair rolling away, she no longer visits this store on her own. (Heinzl Dep. 28:3-8.) Instead, in subsequent visits to this location, she has had her mother or a friend accompany her.

Following this experience, Plaintiff testified that she "told [investigators at Carlson Lynch Sweet & Kilpela, LLP] about my problem with the store and asked them to investigate." (Heinzl Dep. 44:24-45:6.) Thereby, on her behalf, investigators examined over a hundred Cracker Barrel retail locations across seven states. (Compl. ¶ 19; ECF No. 102, Vols. II-V, App. 448-1308 (containing "ADA Report: Cracker Barrel, Pennsylvania, New York, West Virginia, Texas, Kentucky & Ohio locations" and "ADA Report: Cracker Barrel, Tennessee Locations").

<u>Defendant's Remediations</u>

Defendant points out that the architectural barriers that Plaintiff identified at the Pittsburgh, Pennsylvania store and at the other six stores mentioned in the Complaint have been remediated. (ECF No. 66 ¶¶ 6-12 & Expert Reports A.1 to A.7.) Plaintiff admits that these remediations have occurred. (ECF No. 101 ¶¶ 6-12.) However, she notes that this did not occur

---

[4] Defendant denies this statement based on Plaintiff's indication that she had removed the manufacturer-installed braking device from her wheelchair (Heinzl Dep. 30:4-7) and argues that the chair rolling away "was due to Plaintiff's own actions." (ECF No. 107 ¶ 4.) This statement implies that the parking lot did not have an excessive slope, which is contradicted by the Report of Plaintiff's investigators (ECF No. 102, Vol. II, App. 514-17) and Defendant's current position that: "The barriers Plaintiff claims she encountered at the Pittsburgh, Pennsylvania store have since been removed." (ECF No. 66 ¶ 6.)

until after Defendant litigated and lost: 1) a motion to dismiss (ECF Nos. 10, 35); 2) two protective orders seeking to bar class discovery and limit discovery to the location Plaintiff visited (ECF Nos. 20, 30); 3) a motion to stay class discovery until after class certification (ECF No. 32); 4) Plaintiff's motion to compel (ECF No. 27); and 5) Plaintiff's motion for sanctions (ECF No. 41). In addition, and as explained below, Plaintiff asserts that she is challenging Defendant's ADA compliance policy, rather than individual architectural barriers at specific stores.

<u>Defendant's Policies and Practices</u>

Steven Dorsey, Defendant's Senior Director of Construction of Facility Services, admitted that the Company has no formal ADA policy, and does not have a formal process in place to monitor and evaluate ADA compliance at its locations after stores are opened. (Dorsey Dep. 14:6-9, 15:6-10, 26:22-27:1, 74:17-75:4.)[5] Instead, Mr. Dorsey explained, Defendant relies on two processes to monitor ADA compliance following construction: (1) Unit Assessments, which are biennial inspections of Defendant's locations for any and all issues relating to maintenance and physical appearance and; (2) customer complaints. (Dorsey Dep. 19:18-21:6, 107:21-108:7.) Plaintiff states that Defendant's Associate General Counsel, Elizabeth Wilson, corroborated that Defendant primarily uses these two processes to monitor ADA compliance. (Wilson Dep. 7:18-20, 17:23-18:13, 33:4-45:15, 60:6-62:19.)[6]

Defendant denies these statements based upon Wilson's discussion of the "formal process regarding customer complaints" (Wilson Dep. 61:3-4). But Wilson admitted that the Unit Assessment process is formal while customer complaints are "episodic." (Wilson Dep. 62:1-7.) Defendant also cites Dorsey's testimony that he interprets an annual survey conducted on all 637

---

[5] ECF No. 102 Vol. I, App. 61-222.
[6] ECF No. 102 Vol. I, App. 223-373.

stores to constitute a formal process. (Dorsey Dep. 135:12-18.)

The first process – Unit Assessments – requires facility managers to complete a Unit Assessment Form on a biennial basis. (Dorsey Dep. 14:10-15:4, 48:13-51:3, 74:17-75:4.) By way of background, approximately ten facility managers are each assigned an approximately equal number of Defendant's 637 stores, and each is responsible for performing the Unit Assessment of those stores. (Wilson Dep. 17:21-18:13, 33:4-34:15, 123:21-124:5.) Defendant's facility managers have no formal training in identifying ADA violations, aside from "quarterly meetings where they go over topics of interest," which may or may not include ADA issues (Wilson Dep. 124:18-24; Dorsey Dep. 32:10-12, 136:11-24), and are not provided the appropriate tools to measure the slopes of Defendant's parking facilities. (Dorsey Dep. 57:12-14, 74:17-75:4, 89:3-9.) Instead, facility managers evaluate ADA compliance through "obvious visibility issues…." (Dorsey Dep. 89:3.)

Dorsey did state that, at quarterly meetings, he asks the legal department to provide direction to facility managers that they need to know about the ADA. (Dorsey Dep. 57:8-11.) See also Wilson Dep. 124:21-24.

As recently as December 17, 2014 at least one facility manager was unsure how he was supposed to assess properties for ADA work. See Email Between Shane Brock and Dan Sherfy, ECF No. 102, Vol. I, App. 382.

Plaintiff states that Wilson did not even know when Defendant first required its facility managers to generally check for ADA compliance during the Unit Assessments. (Wilson Dep. 59:20-60:5.) Defendant responds that Wilson did testify that she knew that facility managers had been checking for ADA compliance for as long as she could remember, that she had worked for Cracker Barrel for 16 years and that no one could give a complete history of changes made to the

Unit Assessment form. (Wilson Dep. at 27:8-28:24.)

Plaintiff notes that the Unit Assessment is not an ADA accessibility evaluation. Rather, it is a comprehensive maintenance survey that covers a wide range of issues and inspections, of which compliance with the ADA is but a small part. (Wilson Dep. 17:21-18:13, 32:4-20.) See also Dorsey Dep. 49:1-5 (The purpose behind the Unit Assessment Form is "[f]or the facility manager to do an assessment on the building grounds, roofs; determine what action might need to be needed in the following year.").

Plaintiff contends that the Unit Assessment Process is materially flawed in several important respects. For example, there is no uniform standard by which an ADA assessment is triggered. Rather, included on the Unit Assessment Form, which is several pages and encompasses more than 200 evaluations covering approximately 24 topics, is a single line that facility managers can "check if they felt there was an ADA issue" during their store inspection. (Wilson Dep. 17:21-18:13; see also ECF No. 102, Vol. I, App. 375-381 (sample Unit Assessment Form). This box simply indicates that an ADA Assessment is needed based on the facility manager's perception, but facility managers have no tools to use or formal training in identifying accessibility barriers. (Dorsey Dep. 32:10-12, 136:11-24.) Out of these 200 inspection items there is a single generic box titled "ADA Assessment needed" and a box beneath it entitled "Sidewalk from dining room to emergency exit ADA compliant." See Unit Assessment Form, App. 375.

Mr. Dorsey testified that, beginning in September 2015, every facility manager, for the first time, was going to be given a laser level to assess the slope at each parking facility at Defendant's stores. (Dorsey Dep. 57:12-58:13.) However, when Plaintiff inquired in her Third Set of Interrogatories if Defendant has made any changes or modifications to its ADA policies or

practices since the beginning of this litigation, Defendant responded:

> Defendant has considered but not put into practice any changes to its ADA policies and practices. In 2015, Defendant drafted a revised Unit Assessment Form in an attempt to provide Facility Managers with a more useful tool for evaluating stores under their supervision. However, the utility of the revised Form has not been substantiated and accordingly the form has not been put into use.

(ECF No. 102, Vol. I, App. 420-32, Answer No. 1.) When Ms. Wilson was asked about the use of laser levels, she explained that she "didn't consider that to be a final plan." (Wilson Dep. 16:18-17:7.) Therefore, facility managers are not using laser levels to assess slope at this time. Further, Defendant has no plans to make changes to its ADA policies and practices at any point in the future. (Wilson Dep. 14:19-15:3.) Defendant also indicated that it ultimately did not implement that program because it found that the facility managers who currently are charged with inspecting its stores and ensuring ongoing ADA accessibility were not providing consistent results. (Wilson Dep. 21:2-22:3.)

Defendant has procedures in place to construct and renovate its facilities so that they comply with the ADA: 1) Defendant hires professional architects and engineers to design ADA compliant specifications; and 2) Defendant hires professional contractors to construct and renovate stores based on the architectural and engineering designs. (For construction, see Dorsey Dep. 13:17-14:5, 19:11-17, 21:21-22:15; Wilson Dep. 26:25-27:7, 57:2-57:21; see for renovation, Dorsey Dep. 23:23-25:4, 32:6-9, 76:9-77:1; Wilson Dep. 53:22-55:14.)

However, Defendant rarely, if ever, formally measures the slope, or evaluates the overall ADA compliance, of its parking facilities post-construction. (Dorsey Dep. 44:18-45:23; Wilson Dep. 58:15-59:5.) Plaintiff notes that, even though Defendant claims that it evaluates ADA compliance post-construction when required by state law, it has only identified one state that requires such measurements (Dorsey Dep. 44:18-45:23), and that it has failed to produce any

documents showing that it has ever measured the slopes of its parking facilities post-construction or that it has ever evaluated ADA compliance post-renovation.

Defendant contends that its stores and parking facilities are accessible and ADA compliant as a result of its construction and renovation procedures. See Defendant's Second Supplemental Answers to Plaintiff's First Set of Interrogatories, ECF No. 102, Vol. I, App. 391, 392-93, 394; Wilson Dep. 26:25-27:4, 76:14-77:23.

Ms. Wilson states that: 1) in 2012, after the 2010 ADA standards were promulgated and scheduled to go into effect, Cracker Barrel instituted a company-wide ADA Compliance Plan; 2) Cracker Barrel began voluntary remediation efforts before any litigation had been filed and its Compliance Plan resulted in the identification and removal of ADA barriers in hundreds of its restaurants; 3) utilizing the Compliance Plan, Cracker Barrel has identified and remediated barriers to the exteriors of 64 stores (not counting the 7 stores remediated in response to this lawsuit), even though it never received a single customer complaint about the slope and accessibility of its parking lots; 4) since 2012, Cracker Barrel has spent millions of dollars making the exteriors of its stores ADA compliant; 5) it has scheduled an additional 68 stores for exterior barrier remediation between now and the end of fiscal 2017; 6) parking lots in general have a life span of 10-20 years and it is impossible to know when a parking lot will need to be resurfaced and/or regraded; and 7) each of the seven properties listed in the Complaint was built prior to the promulgation of new ADA standards and was rendered non-compliant by external factors and/or the promulgation of new regulations.  (Wilson Aff. ¶¶ 5-7, 9-13.)[7]

Defendant's 97 Store Pre-ADA Compliance Initiative

Aside from Defendant's construction and renovation procedures and its maintenance

[7] ECF No. 109-1.

practices, Defendant has employed an ADA program specifically targeting 97 stores built before 1993. (Dorsey Dep. at 64:4-66:25; Wilson Dep. 25:15-21; Cracker Barrel Pre-ADA 97 Store Initiative, App. 383-90.)

Defendant hires professional third-party ADA specialists to survey each of these 97 stores, and then completes renovation to the stores and their parking facilities based on the third-party assessments. (Dorsey Dep. 76:2-77:20; Wilson Dep. 48:11-55:14.)

Following the surveys done on the 97 pre-ADA stores and one-time remediation, these stores are subsequently monitored for ongoing accessibility via the Unit Assessment process and Defendant's other maintenance practices identified above. (Dorsey Dep. 33:14-34:5, 69:18-70:5.)

Plaintiff contends that, regardless of whether stores were built before or after the ADA's enactment, Defendant relies on the Unit Assessment Process to identity ADA issues across all of its locations on an ongoing basis. (Wilson Dep. 124:6-17.) If the facility manager checks the box on the Unit Assessment Form indicating that an ADA assessment is needed, Defendant then retains a third party consultant to conduct a survey. (Wilson Dep. 17:21-18:13.) Since about 2011, Defendant has relied on three outside consultants – Quality Project Management ("QPM"), Design and Engineering ("D&E"), and Robert Buck ("Buck") – to complete site surveys and drawings to address ADA issues. (Dorsey Dep. 39:11-40:3, 104:10-25, 115:4-116:4; Wilson Aff. ¶¶ 3-4.) Then, after the survey, Defendant follows a common process for remediating exterior ADA items. See Pl.'s Br. (ECF No. 104) Ex. A (Process Flow for Exterior ADA Items). Yet, even following third party surveys and remediation work, stores are subsequently monitored via the inadequate Unit Assessment Process. (Dorsey Dep. 73:8-75:4.)

To coordinate these third party projects, in January 2014, Mr. Dorsey tasked Daniel

Sherfy – Defendant's Construction Remodel Manager – to resolve all ADA issues. (Dorsey Dep. 70:3-71:16.) Mr. Dorsey explained that he wanted to put all ADA issues "on one person" in the interests of "consistency, ensur[ing] that we have good tracking and good negotiating of bids, combining work." (Dorsey Dep. 117:16-118:9; Wilson Dep. 55:17-56:14. See also ECF No. 104 Ex. B (email from Daniel Sherfy, dated August 11, 2014, stating that he will be "soliciting bids," "preparing contracts for the projects," and appearing "on site on the initial day of construction to kick-off the project").

Moreover, Plaintiff argues that Defendant has adopted the untenable position that structural modifications to its parking facilities are permanent. See Def.'s Br. Summ. J. (ECF No. 65) at 8-9. Specifically, Defendant contends that all of its stores comply with the ADA because they either were initially constructed, and/or subsequently renovated pursuant to ADA compliant designs. See Wilson Dep. 56:23-59:19, 76:20-80:21. See also ECF No. 102, Vol. I, App. 391-406 (Defendant's Second Supplemental Answers to Plaintiff's First Set of Interrogatories, Answers to Interrogatory Nos. 3, 6). Plaintiff argues that Defendant seems to overlook the changing nature of parking lots, in spite of both corporate designees' acknowledgment to the contrary. (Dorsey Dep. 14:10-25; Wilson Dep. 79:3-80:21.)

Throughout discovery, Defendant has produced a selection of site surveys completed by QPM, D&E, and Mr. Buck. Plaintiff's investigators have also conducted site surveys across seven states and have found violations at 107 of Defendant's stores. Plaintiff argues that, if Defendant conducts Unit Assessments on all of its properties once every two years (see Dorsey Dep. 14:10-15:4, 74:17-75:4), Defendant's facility managers must have conducted at least one Unit Assessment, between 2011 and 2015, on each of the 107 stores surveyed by Plaintiff's investigators, but, during that four year span, only found 29 of the 107 stores in violation of the

ADA.

Plaintiff contends that Defendant has failed to discover and appropriately remediate barriers to access at its stores. For example, Defendant's practices and procedures failed to identify the barriers encountered by Plaintiff at Defendant's 200 Davis Boulevard, Pittsburgh, Pennsylvania location. Defendant contends that the Davis Boulevard location was originally constructed in compliance with the ADA. (Wilson Dep. 110:6-16.) Yet, when Plaintiff visited this store, architectural barriers prevented her from independently accessing the store. (Heinzl Dep. 25:1-14, 26:13-16, 36:3-12; see also Compl. ¶¶ 18-19.) Despite taking the position that structural modifications to parking lots are permanent, Defendant has acknowledged that changes to parking lots can occur, due to, inter alia, "erosion or freeze/thaw or the earth moves[.]" (Dorsey Dep. 14:10-25; see also Wilson Dep. 79:3-80:21.) Therefore, Defendant's maintenance practices allowed the Davis Boulevard location to fall out of compliance at the time of Plaintiff's visit, and also allowed the store to remain inaccessible for all of her subsequent visits. (Wilson Dep. 110:6-113:9.) Despite conducting at least two or three Unit Assessments on this property, the Unit Assessment Process failed to identify the barriers. (Wilson Dep. 110:6-113:9.) Moreover, in addition to allowing barriers to occur and persist at its Davis Boulevard location, Defendant's Unit Assessment Process failed to detect and remediate the accessibility failures at the other stores identified in the Complaint as well. (Wilson Dep. 114:14-19.)

To demonstrate the ineffectiveness of Defendant's maintenance practices and its construction and renovation procedures, Plaintiff's Complaint identified seven of Defendant's properties (the "Subject Properties"), all of which discriminated against Plaintiff and other individuals with disabilities by way of existing architectural barriers in the parking facilities. (Compl. ¶ 19; see also ADA Report: Cracker Barrel, Pennsylvania, New York, West Virginia,

Texas, Kentucky & Ohio Locations, Part 1, ECF No. 102, Vol. II, App. 453-72, 514-24.)

After Plaintiff's complaint was filed, Plaintiff's counsel, on her behalf, expanded the investigation to include more than 100 of Defendant's properties located throughout seven states. See ECF No. 102, Vols. II-V.

This investigation identified a total of 107 Cracker Barrel stores with ADA non-compliant parking facilities, which violated the ADA in numerous ways, including excessive slopes in purportedly accessible parking spaces, access aisles, curb ramps and walking surfaces, improper signage, lack of signage, and/or other ADA violations. Id.[8]

Of the 107 stores identified by Plaintiff as inaccessible, Defendant has produced professional third-party ADA assessments showing that it identified 29 of those same stores as ADA-noncompliant. See All Documents Contained in Plaintiff's Appendix, Vol. 6.

Defendant responds that it had already remediated 15 of the stores which Plaintiff's investigators subsequently identified as having been non-compliant and therefore denies the accuracy of their methodology and findings. (ECF No. 109 Ex. 5.)

Defendant believes that these and other professional third-party ADA assessments are accurate. (Wilson Dep. 76:2-79:19, 80:25-86:1.) Additionally, there has never been a time when a professional third-party assessor identified ADA work related to a parking lot and Defendant did not act on it. (Wilson Dep. 88:23-90:5.)

Three of the 29 assessments were conducted after Plaintiff completed her corresponding survey. Compare Defendant's ADA Assessments (ECF No. 102, Vol. VI, App. 1402-07) with

---

[8] Defendant argues that: "Photographic 'snapshots' of strategically placed level slope readings alone do not establish that the overall slopes of the parking spaces in question failed to meet ADA requirements." (ECF No. 107 ¶ 26.) It cites no authority for the proposition that the ADA regulates "overall" slopes (presumably meaning an average) rather than measurements taken at any point along the area in question, nor has it explained its implication that "strategically placed level slope readings" provide inaccurate information.

Declaration of Quinn Riordan, ¶¶ 4(aa)-(cc) (ECF No. 102, Vol. VII, App. 1436-38).  The 26 remaining assessments of the 29 were conducted before Plaintiff completed her corresponding survey. Compare Defendant's ADA Assessments (ECF No. 102, Vol. VI, App. 1309-1401) with Riordan Decl. ¶¶ 4(a)-(z).

Plaintiff notes that, for some of these 26 stores, Defendant's previous assessment found certain features accessible, while Plaintiff's subsequent assessment found the same features inaccessible, meaning these properties have fallen out of compliance since Defendant's original assessment. For example:

a. On November 15, 2011, Buck assessed Defendant's 3454 Percy Priest Drive, Nashville, Tennessee property and found no sloping issues with the accessible parking spaces or access aisles. (ECF No. 102, Vol. VI, App. 1309-12.) Plaintiff surveyed the same property on May 18, 2015, and found excessive slopes in purportedly accessible parking spaces and access aisles. (ECF No. 102, Vol. IV, App. 806-14);

b. On July 19, 2013, QPM assessed Defendant's 1791 Lexington Road, Richmond, Kentucky property and found no sloping issues with access aisles and accessible parking spaces. (ECF No. 102, Vol. VI, App. 1383-84.) Plaintiff surveyed the same property on May 20, 2015, and found excessive slopes in the access aisles and purportedly accessible parking spaces. (ECF No. 102, Vol. IV, App. 730-36.)

Plaintiff further observes that, for other of these 26 stores, Defendant's previous assessment noted architectural barriers, which also were noted on Plaintiff's subsequent survey, suggesting that Defendant has either failed to complete remediation one, two, or even three years since discovering ADA violations, or that Defendant did complete remediation and the barriers have since recurred. For example:

a. On October 10, 2012, Buck assessed Defendant's 1021 Cosby Highway, Newport, Tennessee property and found excessive slopes in purportedly accessible parking spaces. (ECF No. 102, Vol. VI, App. 1365-70.) Plaintiff surveyed the same property on May 19, 2015, and found excessive slopes in purportedly accessible parking spaces. (ECF No. 102, Vol. IV, App. 956-59);

b. On July 8, 2013, QPM assessed Defendant's 6801 Shelby Oaks, Memphis, Tennessee property and found excessive slopes in all purportedly accessible parking spaces and access aisles. (ECF No. 102, Vol. VI, App.1373-74.) Plaintiff surveyed the same property on May 21, 2015, and found excessive slopes in purportedly accessible parking spaces and access aisles. (ECF No. 102, Vol. V, App. 1238-44.)

Plaintiff notes that at the 9214 Park West Boulevard, Knoxville, Tennessee property, Mr. Buck found signage issues in November 2011, and Plaintiff found those same issues in 2015. Compare ECF No. 102 Vol. VI, App. 1333-36 with ECF No. 102, Vol. IV, App. 1010-16; see also Wilson Dep. 90:12-94:9. Plaintiff contends that, although Defendant claims installing signage is a "quick fix" (Wilson Dep. 44:8-45:21), this store either has been without signage for over three years, or had signage installed, but then had those signs taken down. Defendant responds that:

> Plaintiff has not established that the same violations in the same locations were noted by both sets of surveys. The Buck photographs indicate that a sign was not installed at the space just left of the Cracker Barrel sign, but the Carlson Lynch photographs show that a sign was installed in that space, indicating that Cracker Barrel had replaced missing signage in between the two inspections.

(ECF No. 107 ¶ 33.)

Plaintiff states that she has identified architectural barriers at stores that were included in Defendant's 97 store pre-ADA compliance initiative and that she has conclusively been able to determine had all ADA remediation work completed before Plaintiff conducted her

corresponding and subsequent surveys, which found that barriers had either developed or recurred since remediation. For example:

a. On November 15, 2011 Buck assessed Defendant's 350 South Mount Juliet Road, Mount Juliet, Tennessee property. See ECF No. 102 Vol. VI, App. 1313-17. As of January 1, 2014 or March 17, 2014, all exterior ADA work was completed. (Vol. I, App. 407, 408.) On May 15, 2015, however, Plaintiff surveyed the same property and found a narrow access aisle, lack of access aisles, and excessive slopes in a curb ramp, an access aisle, and purportedly accessible parking spaces. (Vol. IV, App. 815-25.)

b. On November 16, 2011 Buck assessed Defendant's 23 Executive Drive Crossville, Tennessee property. (ECF No. 102 Vol. VI, App. 1325-1328.) As of July 2, 2013, all ADA work was completed. (Vol. I, App. 409-10.) On May 18, 2015, however, Plaintiff surveyed the same property and found excessive slopes in an access aisle and purportedly accessible parking spaces. (Vol. IV, App. 865-73.)

c. On November 16, 2011 Buck assessed Defendant's 5001 Central Avenue Pike, Knoxville, Tennessee property. (Vol. VI, App. 1329-32.) As of As of January 1, 2014 or March 17, 2014, all ADA exterior work was completed. (Vol. I, App. 407, 408.) On May 18, 2015, however, Plaintiff surveyed the same property and found excessive slopes in a curb ramp, access aisles, and purportedly accessible parking spaces. (Vol. IV, App. 897-909.)

Defendant's Admissions and Denials

Plaintiff notes that Defendant admits that parking lots are receptive to change and that their structural elements are not permanent:

> Q: [Mr. Dorsey's] testimony was this is what happens, there is weather, there is, you know, the earth moves and stuff happens at locations and that is why – that's why you have these changes overtime after construction; is that fair?

A: Yes – I remember him saying that at his deposition.

Q: Do you have any reason to doubt that that is accurate?

A: Well, there could be other reasons for changes but, yes.

Q: Sure.

A: Yes, parking lots change.

(Wilson Dep. 79:20-80:15.)  Mr. Dorsey testified as follows:

Q: So, if there was a – if there was a gap in the scope of work prepared, then there would be a gap in the ADA compliance because that work wouldn't have been done?

A: Correct. The underlying issue is, [d]id weather then make changes to what work was done two years ago[.]

(Dorsey Dep. 129:17-25.)

Additionally, Defendant contends that the 200 Davis Boulevard, Pittsburgh Pennsylvania location originally was constructed in compliance with the ADA. (Wilson Dep. 106:22-113:15.) Nevertheless, when Plaintiff originally visited this store, and for all subsequent visits, architectural barriers were present and impeded her ability to independently access the store. (Heinzl Dep. 25:1-14, 26:13-16, 36:3-12; see also Vol. II, App. 514-18.)

Further, Defendant specifically admitted that structural modifications at two of its stores were not permanent.  Defendant's witnesses testified that its 3280 Towne Boulevard, Middletown, Ohio and 275 Brenton Way, Shepherdsville, Kentucky stores both were constructed and/or renovated so as to comply with the ADA. (See for Ohio location, Wilson Dep. 76:2-79:19; see for Kentucky location, Wilson Dep. 80:25-86:1.)  Nevertheless, Defendant recognized that its own professional third-party assessor found ADA violations at the parking facilities of each store. Thus, Defendant admitted structural modifications to its parking facilities are not permanent. (Wilson Dep. 76:2-79:19, 80:25-86:1.)

Defendant was unaware of and failed to catch the violations at the Subject Properties and Defendant admits this:

> A: And we had no customer complaints about the stores either so there would have been no reason to inspect them because, again, we didn't have knowledge of any issues.
>
> …
>
> Q: You also had no notice because the facility services manager during their routine inspection of facilities didn't indicate that an ADA inspection was necessary, correct?
>
> A: Right but you also who knows when the problem arose it could have been off cycle.
>
> …
>
> Q: Similarly, that is because similar to the Robinson Towne Center location [the restaurant visited by Plaintiff] that is because there was not a need indicated by the facility services manager during the unit assessment process or because of a consumer complaints or some other event that such an evaluation was necessary; correct?
>
> A: We had no knowledge at the time that something was needed to be remediated.
>
> Q: At any of those other stores we just spoke about?
>
> A: Right.
>
> Q: That is because you had not received a customer Complaint about the parking lots; correct?
>
> A: About the slopes or parking lots of paths of travel, that is correct.
>
> Q: And the unit assessment process hadn't resulted in the facility services manager indicating that a third-party ADA inspection was necessary at that store; correct?
>
> A: Correct.

(Wilson Dep. 112:15-18, 112:24-113:6, 115:20-116:17; see generally Wilson Dep. 106:22-119:1.)

The Subject Properties were remediated only as a result of this litigation and Defendant admits this:

> Q: And when our – when the lawsuit was filed, a determination was made in Cracker Barrel to remediate the property?
>
> A: Yes.
>
> Q: On the basis of our Complaint?
>
> A: Yes.
>
> …
>
> Q: And a similar determination I assume was made with regard to all of the other properties in the Complaint; correct?
>
> A: That they needed to be remediated?
>
> Q: Yes.
>
> A: Yes.

(Wilson Dep. 113:10-15; 114:14-19; see generally Wilson Dep. 106:22-119:1.)

Defendant contends that it would have discovered and remediated the barriers anyway as part of its ongoing voluntary ADA compliance plan or that remediation is unnecessary. See Wilson Aff. Ex. 5 (showing that Cracker Barrel had scheduled 13 stores for remediation which Plaintiff's investigators allege to be non-complaint as part of this lawsuit); Wilson Aff. ¶ 15 (noting that Cracker Barrel closed its Charleston and West Virginia stores after his lawsuit was filed, making remediation unnecessary).

Defendant admits that it intends to continue applying and implementing its current ADA compliance policies and practices identified above to all of its stores, including the Subject Properties. (See ECF No. 102, Vol. I, App. 420, 423-24; Wilson Dep. 14:4-15:3, 31:16-32:3; 118:21-119:1.)

Plaintiff states that Defendant introduced no evidence that it intends to, or is willing to maintain compliance at the Subject Properties. Defendant responds that its voluntary compliance program continues unabated and that it has produced evidence that it has spent and budgeted millions of dollars and scheduled remediations through fiscal year 2017. (Dorsey Dep. 80:19-25; Wilson Aff. ¶ 10; see also Wilson Aff. Ex. 5.)

Plaintiff states that Defendant introduced no evidence that it has an effective ADA maintenance policy or practices capable of maintaining compliance at the Subject Properties or any of the Defendant's stores. Defendant responds that Plaintiff has admitted that "Defendant has procedures in place to construct and renovate its facilities so that they comply with the ADA." (ECF No. 102 ¶ 18.)

Plaintiff states that Defendant introduced no evidence showing remediation was the result of a plan or policy that eventually would have caught the ADA violations or that such a plan or policy currently is in place and effective. Defendant denies this statement. See Wilson Aff. Ex. 5 (showing that Cracker Barrel had scheduled 13 stores for remediation which Plaintiff's investigators allege to be non-complaint as part of this lawsuit).

Defendant's witnesses testified that Cracker Barrel never received complaints about its parking lots. (Wilson Dep. 128:10-18.) However, at least two lawsuits have been filed in regards to sloping violations at Defendant's stores. (ECF No. 102, Vol. I, App. 411; see also Wilson Dep. 128:19-129:19.) Defendant responds that the cited testimony refers to customer complaints documented through Cracker Barrel's complaint process, not lawsuits. (Wilson Dep. 61:2-12.)

Plaintiff states that Defendant refuses to admit wrongdoing in this case:

a. Defendant refuses to admit that its ADA compliance policies are inadequate or recognize its systemic compliance failures. (Answer (ECF No. 40) ¶¶ 4, 11, 21);

b. Defendant refuses to admit that any of its properties, including the Subject Property, are or were noncompliant. (Answer ¶¶ 18-21, 34-35, 38-40; Def.'s Answers Pl.'s First Set Interrog., App. 433, 436-37; Def.'s Second Supp. Answers Pl.'s First Set Interrog., ECF No. 102, Vol. I, App. 391, 394, 395.)

Defendant responds that it "does deny that its voluntary ADA Compliance Plan violates the ADA, but Defendant has admitted that the subject properties contained barriers to access that were in need of remediation, and the fact that it admits that it made those remediations constitutes such an admission as a matter of law." (ECF No. 107 ¶ 46.)

Procedural History

Plaintiff filed this action on October 27, 2014. Federal question jurisdiction is based on the ADA claim, 28 U.S.C. § 1331; 42 U.S.C. § 12188(a). She alleges that the cited violations constitute "a failure to remove architectural barriers" in violation of 42 U.S.C. § 12182(b)(2)(A)(iv) and a failure to alter, design or construct accessible facilities after the effective date of the ADA in violation of § 12183(a)(1) and the appropriate regulations, which will deter her and similarly situated individuals from returning to Defendant's facilities and that, without injunctive relief, she will be unable to fully access Defendant's facilities in violation of her rights under the ADA. (Compl. ¶¶ 34-41.) She also brings this action on behalf of all others similarly situated pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. (Compl. ¶¶ 25-30.)

On December 1, 2014, Defendant filed a motion to dismiss on the ground of standing (ECF No. 10). On December 22, 2014, Plaintiff filed a brief in opposition (ECF No. 14). On April 24, 2015, the Court entered an order denying Defendant's motion to dismiss (ECF No. 35).

Following a period of discovery, Defendant filed a motion for summary judgment on the

ground of mootness (ECF No. 64) on September 8, 2015.  Plaintiff filed a response on December

15, 2015 (ECF No. 105) and Defendant filed a reply brief on January 4, 2016 (ECF No. 106).

On December 15, 2015, Plaintiff also filed a motion to certify class (ECF No. 103).  Defendant

filed its response in opposition on January 4, 2016 (ECF No. 108) and Plaintiff filed a reply brief

on January 6, 2016 (ECF No. 110).  A hearing was held on the class certification motion on

January 7, 2016.

### Timing of Filings[9]

At a settlement conference held on January 7, 2016 prior to the hearing on the motion for

class certification, Defendant's counsel, Attorney Laura Mall, was asked why she had filed her

brief in opposition to the motion on January 4, 2016 when an Order of Court dated November

20, 2015 explicitly set the filing deadline as December 31, 2015 (ECF No. 99).[10]  In response,

Attorney Mall invoked the "3-day rule," Fed.R.Civ.P. 6(d), claiming that it permitted her to add

three days to the date the brief was due pursuant to Rule 6(a).  She was wrong: "The time-

computation provisions of subdivision 6(a) apply only when a time period must be computed.

They do not apply when a fixed time to act is set."  Miller v. City of Ithaca, 2012 WL 1589249,

at *1 (N.D.N.Y. May 4, 2012) (quoting Advisory Committee Notes to 2009 Amendments to

subdivision (a) of Rule 6).  See also Meeks v. Powers, 2010 WL 4286319, at *2 (D.S.C. Oct. 18,

2010) ("Defendants essentially take the position that Rule 6(a)(1)(C) trumps the plain language

of the Magistrate Judge's Order … set[ting] the deadline….  The Magistrate Judge's order,

however, did not require that Defendants compute a time period.  It clearly stated that

---

[9] The discussion that follows applies with equal force to the reply brief in support of Defendant's motion for summary judgment, which was also due by December 31, 2015 but not filed until January 4, 2016.

[10] This date was not chosen at random, but was designed to provide the Court and Plaintiff with sufficient time to review the response prior to the hearing scheduled for January 7, 2016.

Defendants' papers were due on a date certain.")  Because the order of Court set a deadline of December 31, 2015, no computations of time were necessary and the brief was due on that date.

Attorney Mall also argued that her brief did not have to be filed on December 31, 2015 because Chief Judge Conti had issued a notice that the Court would be "closed" on that day. This argument is also erroneous.[11]  Attorney Mall cannot argue that December 31 was a "legal holiday" as that phrase is defined in Rule 6(a)(6) for purposes of calculating a date under Rule 6(a)(1)(C) because it is not listed as a day set aside by statute, Rule 6(a)(6)(A), and she has not argued, much less demonstrated, that it was appointed a holiday by the President or Congress, Rule 6(a)(6)(B), or by the Governor or Legislature of the Commonwealth of Pennsylvania, Rule 6(a)(6)(C).  As for the argument that the closing of the Clerk's Office by the Chief Judge is equivalent to a legal holiday under Rule 6(a):

> the plain language of the Rule precludes such a reading. The Rule, on its face, refers to a "legal holiday" as a day appointed by the President, Congress, or the relevant state. It does not grant this power to the federal judiciary.

García-Velázquez v. Frito Lay Snacks Caribbean, 358 F.3d 6, 9 (1st Cir. 2004) (explicitly rejecting the contention that New Year's Eve is a "legal holiday").

Nor could Attorney Mall contend that the Clerk's Office was "inaccessible" on December 31, 2015 under Rule 6(a)(3) because, pursuant to the electronic filing features of ECF, the Clerk's Office is always open for the reception of electronic filings, including on weekends and holidays.  In re Buckskin Realty, Inc., 2015 WL 94536, at *11 (Bankr. E.D.N.Y. Jan. 6, 2015). See also Miller, 2012 WL 1589249, at *3 ("the Clerk's office **is** accessible when electronic filing is available. With electronic filing, the Clerk's office was accessible for purposes of filing papers

---

[11] The Clerk of Court, in a message that was placed on the Court's website and sent out to all counsel via email, specifically referred counsel to Rule 6(a) which, as explained in the text, makes clear that the closing of the Court on December 31 did not create a "legal holiday" or extend filing deadlines.

and Defendants could have filed their motion in a timely manner."); Westfield Ins. Co. v. Interline Brands, Inc., 2013 WL 1288194, at *5 (D.N.J. Mar. 25, 2013) ("Due to the electronic filing capabilities of the court, the Watts Defendants were able to file their Notice of Removal on October 31, 2012, on the electronic filing system (CM/ECF) despite the fact that the Clerk's Office was physically inaccessible on that date [because of Hurricane Sandy].")

Moreover, if the Clerk's Office is deemed to have been "inaccessible" on December 31, 2015, the Court would have to conclude that it would similarly have been "inaccessible" on Monday, January 4, 2016 at 7:07 p.m., when Attorney Mall finally filed the response brief, because the Clerk's Office closes at 4:30 p.m. (See NEF to ECF No. 108.) In summary, no provision of Rule 6 allowed for a brief due on December 31, 2015 to be filed after that date.

Finally, it must be noted that this is the second time this kind of issue has arisen in this case. On December 1, 2014, Defendant filed a motion to dismiss (ECF No. 10) and a briefing order set Plaintiff's response date as December 22, 2014 (ECF No. 12). Plaintiff filed her response on that date as ordered (ECF No. 14) and the briefing order did not contemplate a reply brief. On January 5, 2015, a Report and Recommendation was filed (ECF No. 15), recommending that the motion be denied. Attorney Mall called Chambers immediately thereafter to complain that the R&R was "premature" and to request that the undersigned "vacate" the R&R. Her argument was based upon the following calculations: 1) her reply brief would have been due on December 29, 2014 (7 days after the brief in opposition was filed), but; 2) invoking Rule 6(d), she added three days to the due date and arrived at New Year's Day, a "legal holiday" under Rule 6(a)(6)(A), thereby giving her another day, but; 3) Chief Judge Conti had announced that the Court would be closed on Friday, January 2, 2015 and therefore she did not have to file her brief on that day, or the Saturday or Sunday which followed, and thus; 4) her

brief was actually due on January 5, 2015. As the analysis above explains, even assuming that her first two arguments passed muster,[12] the third one absolutely did not and therefore her brief would have been due no later than January 2, 2015. Attorney Mall made no effort to contact the Court to confirm that her calculations were correct or to request an extension of time.

Attorney Mall was notified that the R&R would not be vacated. Rather, she was asked to include the substantive arguments she had intended to make in her reply brief with the objections she would file to the R&R. On January 20, 2015, Attorney Mall filed her objections to the R&R and included a footnote again arguing that "the Magistrate Judge issued his R&R before Defendant's filing deadline to file its Reply Brief." (ECF No. 16 at 1 n.1.) In the order denying Defendant's motion to dismiss, Judge Hornak indicated that the "Court does not find [this and other footnotes made in the objections] apt to the matters now before the Court." (ECF No. 35 at 2 n.1.) Judge Hornak further observed that Attorney Mall had filed a reply brief to the objections (a filing not contemplated by the Federal Rules of Civil Procedure, the Local Rules of this Court or any judge's practices and procedures) without seeking leave of the magistrate judge. Id.

Given this history, it is (to say the least) surprising that Attorney Mall did not contact the Court to explain the calculations that led her to conclude that her response was due until January 4, 2016. Nor did she request an extension of time in which to file the response, even when she telephoned Chambers on December 30, 2015 to confirm that she could file a 30-page brief in response to Plaintiff's brief of the same length.

Nevertheless, the Court should accept the untimely filed response brief and consider the arguments made therein, for two reasons. First, it is noted that Attorney Mall incorporated the

_____

[12] The first argument assumes that Judge Hornak's practices and procedures, which allow for a reply brief to be filed within 7 days of an opposition brief, applied to this case. Because the briefing order was issued by a magistrate judge on referral from a district judge, it is not clear whether the district judge's practices and procedures would govern.

arguments by reference and reiterated them at the hearing on January 7, 2016.  Second, there is a "preference expressed in the Federal Rules of Civil Procedure in general … for resolving disputes on their merits."  Krupski v. Costa Crociere S.p.A., 560 U.S. 538, 550 (2010).  The same is true of Plaintiff's reply brief.

Motion for Class Certification

Plaintiff argues that: 1) courts routinely certify classes for injunctive relief under the ADA where removal of an architectural barrier or modification of a policy will affect the entire class; 2) the requirement of numerosity is met because thousands of people with mobile disabilities patronize Defendant's stores, as shown by census data and admitted by Defendant's witnesses; 3) the requirement of commonality is met where a common policy affects the entire class; 4) the requirement of typicality is met because her claims are representative of the class; 5) the requirement of adequacy is met because the law firm of Carlson, Lynch, Sweet and Kilpela has extensive experience in handling ADA Title III cases; and 5) a single injunction would provide relief to the entire class.

Defendant argues that: 1) the ADA does not authorize the kind of relief that Plaintiff seeks, only an injunction to remove architectural barriers, not to "modify" an ADA compliance policy already in place and she relies on Title II cases (involving public entities), which are different from Title III cases; 2) Plaintiff lacks standing to pursue policy-related relief because she has not suffered injury in fact, the seven stores identified in the Complaint have been remediated and thus she cannot point to a "real and immediate threat" of future injury and any potential future injuries will not be traceable to Defendant but to weather and other factors outside its control; 3) injunctions ordering parties to "comply with the law" are overbroad; 4) she cannot satisfy numerosity based on pure speculation; 5) she cannot satisfy commonality because

Title III does not require compliance plans; 6) she cannot satisfy typicality because her proposed remedy (improving the Unit Assessment form) will not alter the result and she is subject to unique defenses (such as being a "paid tester"); and 7) she cannot satisfy adequacy because of the unique defenses and because she has moved to Arizona, which has made her participation in the case more difficult.

In a reply brief, Plaintiff responds that: 1) modification of a policy is expressly provided for in the statute and regulations; and 2) the elements for class certification are met, as she explained in her principal brief.

Scope of ADA Relief

Title III of the ADA "prohibits discrimination against the disabled in the full and equal enjoyment of public accommodations." Spector v. Norwegian Cruise Line Ltd., 545 U.S. 119, 128 (2005). Specifically, it requires "places of public accommodation" to "remove architectural barriers … in existing facilities … where such removal is readily achievable," 42 U.S.C. § 12182(b)(2)(A)(iv), and to "design and construct facilities for first occupancy [no] later than 30 months after July 26, 1990 that are readily accessible to and usable by individuals with disabilities," § 12183(a). Places of public accommodation include "a restaurant, bar, or other establishment serving food or drink," § 12181(7)(B), and thus include Cracker Barrel. Failure to meet these requirements constitutes a violation of the ADA which may be enforced by individuals bringing suit for injunctive relief in federal court, § 12188(a). The statute further states that "injunctive relief shall also include … modification of a policy…." Id.

"Under Title III of the ADA, private plaintiffs may not obtain monetary damages and therefore only prospective injunctive relief is available." Anderson v. Macy's, Inc., 943 F. Supp. 2d 531, 538 (W.D. Pa. 2013) (citation omitted). See 42 U.S.C. § 12188(a) (providing that the

remedies available to individuals shall be those set forth in 42 U.S.C. § 2000a-3(a), which allows a private right of action only for injunctive relief for violations of Title II of the Civil Rights Act of 1964); Newman v. Piggie Park Enters., Inc., 390 U.S. 400, 402 (1968) (noting that Title II allows for injunctive relief only).

Defendant argues that the provision regarding modification of a policy has been applied only to a situation in which a place of public accommodation enforces a "policy" that discriminates against individuals with disabilities.  It cites cases requiring modification of a policy when: an arts center prohibited service dogs, Lentini v. California Center for the Arts, 370 F.3d 837, 843-46 (9th Cir. 2004); a movie theater allowed non-disabled patrons to sit in seats designated for disabled patrons and their companions, Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1087 (9th Cir. 2004); and a store refused to reconsider its policy of not selling alcohol to people who were intoxicated when a customer explained that he suffered from brain damage that gave the appearance that he was intoxicated when he was not, Dudley v. Hannaford Bros. Co., 333 F.3d 299 (1st Cir. 2003).

Although these cases involved policies of the kind Defendant describes, they did not hold that other kinds of policies cannot violate the ADA.  For this proposition, Defendant cites Gaylor v. Greenbriar of Dahlonega Shopping Center, Inc., 975 F. Supp. 2d 1374 (N.D. Ga. 2013).  In that case, a customer who suffered from MS brought suit against a shopping center with architectural barriers.  The court held that the barriers violated the ADA, but with respect to the plaintiff's claims about a discriminatory policy, the court stated as follows:

> Plaintiff contends that [he] is also entitled to summary judgment on [his] claim that Defendant has a discriminatory policy toward the disabled. The only allegation in the complaint relating to this claim states: "Defendant either does not have a policy to assist people with disabilities or refuses to enforce such a policy if it exists." In [his] motion for summary judgment, Plaintiff relies on the following undisputed facts in support of this claim: (1) Defendant has no official

policy regarding how disabled patrons are treated; (2) Defendant has an unofficial policy of helping people who need it; (3) Defendant has not written down this unofficial policy or communicated it to the tenants of the property; (4) Defendant does not provide any training to its tenants or employees regarding the accommodation of disabled persons; (5) Defendant has placed no individual in charge of making sure its property complies with the ADA; and (6) Defendant presumed that an inspection by the City in 1981—more than a decade before the ADA became law—ensured compliance with the ADA.

The Court concludes that these facts do not establish a violation of the ADA, and that Defendant, rather than Plaintiff, is therefore entitled to summary judgment on this claim. Plaintiff's reliance on broad statements by Congress and the courts regarding the nature of discrimination against the disabled and the goals of the ADA is misplaced. None of these statements indicates that it is violation of the ADA for the owner of a public accommodation not to have an official policy regarding the treatment of disabled persons, or to have an unofficial policy of helping people who need it, regardless of whether the policy is written down or communicated to anyone. Nor does Plaintiff cite any provision of the ADA requiring an owner to put someone in charge of ADA compliance, or any authority that an owner's mistaken assumption that it is in compliance with the ADA is itself a violation of the law.

Finally, with regard to Defendant's failure to provide any training to its tenants or employees regarding the accommodation of disabled persons, Plaintiff cites no provision of the ADA requiring a defendant in a case involving architectural barriers to provide any such training. Plaintiff relies on the Second Circuit's decision in Camarillo v. Carrols Corp., 518 F.3d 153 (2d Cir. 2008). That case, however, did not involve architectural barriers but an owner's alleged failure to take steps necessary to ensure against discrimination because of the absence of auxiliary aids and services. See 42 U.S.C. § 12182(b)(2)(A)(iii). The court held that an owner's failure to effectively train employees how to deal with disabled individuals could violate that provision of the ADA. Camarillo, 518 F.3d at 157 (alleged failure by owners of fast food restaurants, which did not provide large print menus, to train employees how to deal with legally blind plaintiff could violate requirement to ensure that disabled individuals not treated differently from others due to absence of auxiliary aids or services).

Plaintiff in this case has not alleged a violation of Title III's provision regarding auxiliary aids and services. Instead, he alleges only the existence of architectural barriers. Plaintiff cites no provision of the law regarding architectural barriers that imposes a duty on an owner to train others in how to deal with disabled individuals. Instead, the provisions on which Plaintiff relies require an owner either to remove architectural barriers from existing facilities, or to make new construction and alterations readily accessible to and usable by disabled individuals, and nothing more. See 42 U.S.C. §§ 12182(b)(2)(A)(iv) & 12183(a). Therefore, Plaintiff's claim based on an alleged discriminatory policy must fail.

Id. at 1394-95 (footnote and record citations omitted).

Defendant also contends that Plaintiff is relying on cases arising under ADA Title II (regarding public entities), which has heightened compliance obligations, rather than Title III, which concerns public accommodations. See 28 C.F.R. § 35.105 (requiring public entities to evaluate their current services, policies and practices and make necessary modifications thereto); § 35.150(d) (requiring public entities that employ more than 50 persons to develop a transition plan setting forth the steps necessary to complete such changes). Defendant argues that Plaintiff relies on Californians for Disability Rights, Inc. v. California Department of Transportation, 249 F.R.D. 334, 341 (N.D. Cal. 2008) ("Caltrans"), in which the court indicated that it could craft injunctive relief under these regulations to require the California Department of Transportation to set milestones and benchmarks for fixing barriers to access. However, Plaintiff cites the Caltrans case for its discussion of the Rule 23 factors, not the issue of whether injunctive relief is available under these circumstances. Moreover, the court in Caltrans actually held that there is no private right of action to enforce either the self-regulation or transition plan regulations under Title II. Id. at 341-42. Thus, to the extent that Title II and Title III have different regulations, the distinction is without a difference from the perspective of a private plaintiff bringing a suit for enforcement of a violation.

Plaintiff responds that the plaintiff in Gaylor provided scant evidence of failure to maintain accessible features and that the court failed to consider provisions of the ADA and its implementing regulations that would encompass a situation such as this one. Unlike the plaintiff in Gaylor, Plaintiff herein does not rely on broad statements by Congress and the courts regarding the nature of discrimination and the goals of the ADA, Plaintiff does not contend that Defendant violated the ADA merely because it mistakenly thought it was in compliance with the

29

law, and Plaintiff does not cite a lack of training regarding the accommodation of disabled persons as an ADA violation (rather, she contends that the facilities managers lack training in ADA compliance in order to demonstrate that Defendant's ADA compliance policy is ineffective). Thus, Gaylor (which is not binding on this Court in any event) is distinguishable.

In addition to § 12188(a)(2), which as noted above, expressly provides for "modification of a policy" as a form of relief, Plaintiff also cites 28 C.F.R. §§ 36.211 and 36.501. The first regulation requires public accommodations to "maintain in operable working order those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act." The second provision states that:

> In the case of violations of §§ 36.304, 36.308, 36.310(b), 36.401, 36.402, 36.403, and 36.405 of this part, injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by the Act or this part. Where appropriate, injunctive relief shall also include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods, to the extent required by the Act or this part.

28 C.F.R. § 36.501(b). Plaintiff notes that § 36.211 is not included in the first sentence, which limits the injunctive available for violations that are predicated solely on structural barriers. She contends that, when a public accommodation violates other sections of the ADA, relief is not so limited, but as the second sentence indicates, it shall also include "modification of a policy."

Plaintiff also cites cases which, she notes, implicitly recognize the relief she seeks here. See Sawczyn v. BMO Harris Bank Nat. Ass'n, 8 F. Supp. 3d 1108, 1115 (D. Minn. 2014) (denying a voluntary cessation defense, in part, on the basis that the defendant could not show that it would maintain compliance, thereby implicitly holding that an injunction against the defendant's maintenance policy or practice is proper under the ADA); Thomas v. Branch Banking and Trust Co., 32 F. Supp. 3d 1266, 1271 (N.D. Ga. 2014) (recognizing that a

defendant's failure to maintain accessibility would preclude application of the voluntary cessation defense and thus, implying that injunctive relief against the defendant's maintenance policy or practice is available under the ADA); National Alliance for Accessability, Inc. v. McDonald's Corp., 2013 WL 6408650, at *7 (M.D. Fla. Dec. 6, 2013) (rejecting Defendant's argument that no relief was available because structural features had been remediated and stating, "[w]hile some aspects of this case may have become moot, the Court finds that, at a minimum, the scope of an injunction directed to maintenance and future compliance remains at issue"); Moeller v. Taco Bell Corp., 816 F. Supp. 2d 831, 861-62, 869 (N.D. Cal. 2011) (rejecting a voluntary cessation defense, even where the defendant had ADA maintenance policies and remediated inaccessible parking lots, because the defendant failed to follow its own policies and could rescind them at any time, ultimately finding "that plaintiffs have established that classwide injunctive relief is warranted, with regard to maintaining compliance, both as to Taco Bell 4518, and as to all corporate Taco Bell restaurants in California.").[13]

As Plaintiff admits, these cases imply, but do not actually hold, that modification of a policy can apply to a case such as this one, because they were discussing other issues such as mootness and standing (which are discussed below). Nevertheless, Defendant (who has raised this argument) has failed to demonstrate that the relief Plaintiff seeks is not available under the ADA. Title III explicitly provides that injunctive relief includes "modification of a policy" and Defendant has not demonstrated that the word "policy" is limited to practices such as, for example, those prohibiting service animals. In addition, the regulations which Plaintiff cites

---

[13] Plaintiff also proffers three examples of courts approving class-wide settlement agreements containing detailed modifications of defendants' ADA monitoring, maintenance, construction and training policies and practices. (ECF No. 110 Exs. A-C.) However, parties may structure settlement agreements in any manner they wish and thus these agreements do not address whether such modifications would be subject to injunctive relief under ADA Title III.

contemplate an ongoing process of effective ADA compliance, which Plaintiff has challenged in this case. And the cases she cites acknowledge that Title III entities are under an ongoing duty to review their places of public accommodation for compliance and to remediate them accordingly. Therefore, this argument should be rejected.

Standing

The Supreme Court has held that:

> In every federal case, the party bringing the suit must establish standing to prosecute the action. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The standing requirement is born partly of "'an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.'" Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quoting Vander Jagt v. O'Neill, 699 F.2d 1166, 1178–1179 (C.A.D.C. 1982) (Bork, J., concurring)).

Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004). The Court has explained that:

> In Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), we held that, to satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envt'l Servs (TOC), Inc., 528 U.S. 167, 180-81 (2000).

Defendant argues that Plaintiff no longer has standing because she does not live near the store at which she encountered an architectural barrier, given that she is attending graduate school in Arizona. However, it cites no authority in support of the premise that an individual who moves away temporarily to attend graduate school cannot have a concrete and specific intent to return to a location. In addition, "Article III standing is determined as of the time a complaint is filed. Standing does not have to be maintained throughout all stages of the

litigation." McDonald's, 2013 WL 6408650, at *7.  See Clapper v. Amnesty Int'l USA, 133

S.Ct. 1138, 1157 (2013) ("we assess standing as of the time a suit is filed").

As this Court held when Defendant filed a motion to dismiss based on standing, Plaintiff

patronizes the Pittsburgh, Pennsylvania store and encountered an architectural barrier there, she

has expressed an intent to return to it (and other Cracker Barrel locations) and she satisfies the

deterrent effect test as well.  She also testified at her deposition that she intends to continue

patronizing this store in the future.  (Heinzl Dep. 23: 19-22.)  Moreover, as explained herein,

because Plaintiff is challenging Defendant's ADA nationwide compliance policy (rather than a

barrier at a specific location), whether she is living in Arizona or Pennsylvania is irrelevant.

Defendant's contentions that Plaintiff will not be "injured" by its allegedly ineffective ADA

compliance policy and that any future violations will be traceable to the weather and not Cracker

Barrel are not supported by logic or the language of the ADA.  Defendant cites no authority to

support the argument that, if its ADA compliance policy is ineffective and results in an

unidentified architectural barrier in a Cracker Barrel parking lot ("caused" by weather or other

external factor), it can continually avoid responsibility for these lapses.  Plaintiff also points to

lack of signage and van accessible parking, which cannot be blamed on external sources.

Under Defendant's construction of the ADA, it could even have an express policy of

ignoring architectural barriers at its stores, then (only when it is sued over such barriers and it has

contested the suit for some time), remediate the barrier and put an end to the matter.  As Plaintiff

observes, the ADA was not intended to work in this fashion: "No individual shall be

discriminated against on the basis of disability in the full and equal enjoyment of the goods,

services, facilities, privileges or accommodations of any place of public accommodation."  42

U.S.C. § 12182(a).

In addition, when a plaintiff has presented a class action complaint, the issue of standing is limited to the plaintiff's individual standing, not whether the plaintiff can challenge policies as they relate to a multitude of locations. Rather, that is an issue of class certification. As the Tenth Circuit has observed:

> Abercrombie insists that our standing analysis does not end at the Park Meadows Mall. It argues that Ms. Farrar lacks standing to bring a claim for nationwide injunctive relief because she does not intend to visit every Hollister store with a porch—over 230 stores nationwide. We have no doubt that if Ms. Farrar were seeking a nationwide injunction in her own right, then she would lack standing to challenge accessibility barriers at stores she never intends to visit. Although the concepts of standing and adequacy of status to maintain a class action appear related, they are independent criteria and must be evaluated separately. <u>See</u> <u>Hassine v. Jeffes</u>, 846 F.2d 169, 175-76 (3d Cir. 1988). The question whether an injunction may properly extend to Hollister stores nationwide is answered by asking whether Ms. Farrar may serve as a representative of a class that seeks such relief. All that is necessary to answer this question is an application of Rule 23.

<u>Colorado Cross-Disability Coalition v. Abercrombie & Fitch Co.</u>, 765 F.3d 1205, 1212-13 (10th Cir. 2014) (<u>CCDC</u>) (footnote and some citations omitted). <u>See also</u> <u>Garner v. VIST Bank</u>, 2013 WL 6731903, at *9 (E.D. Pa. Dec. 20, 2013) (plaintiff satisfied standing requirements with respect to the ATM he used and the challenges to the remaining ATMs represented an issue of class certification, not standing).

Defendant argues that an injunction ordering it to "comply with the law" is overbroad. <u>Belitskus v. Pizzingrilli</u>, 343 F.3d 632, 650 (3d Cir. 2003). Defendant cites a case in which Judge Eddy cited this proposition in denying a motion for class certification. She stated that:

> The injunction Plaintiff seeks is little more than "obey the law"—remediate parking lots that may have fallen out of compliance to comply with the ADA maximum sloping requirements. As Bob Evans notes, the differences and unique designs of each lot, and lack of commonality, makes it impossible to craft one injunction that remedies all injuries to the class in one stroke. Bob Evans' conduct is not such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them, nor can it answer the common question in one stroke.

<u>Mielo v. Bob Evans Farms, Inc.</u>, 2015 WL 1299815, at *12 (W.D. Pa. Mar. 23, 2015).

In this case, however, Plaintiff is not seeking an injunction that merely seeks to have Defendant obey the law or to merely "remediate parking lots that have fallen out of compliance." Rather, she requests that Defendant be compelled to put in place an ADA compliance policy that will effectively take note of ADA violations on an ongoing basis so that they can be remedied and Defendant's stores remain compliant. For these reasons, Defendant's argument should be rejected and the Court can turn to an evaluation of the Rule 23 factors.

<u>Rule 23 Requirements</u>

"To obtain class action certification, plaintiffs must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met." <u>Baby Neal for & by Kanter v. Casey</u>, 43 F.3d 48, 55 (3d Cir. 1994). Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These factors are usually referred to as "numerosity," "commonality," "typicality" and "adequacy."

<u>Numerosity</u>

Plaintiff contends that numerosity "is generally satisfied where the class claims involve more than forty plaintiffs. Nevertheless, it is not required that the lead plaintiff demonstrate the precise number of class members when a reasonable estimate can be inferred from the record."

In re Rent-Way Sec. Litig., 218 F.R.D. 101, 112 (W.D. Pa. 2003) (citing Stewart v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001)).  Plaintiff contends that courts frequently use census data and common sense to determine that numerosity has been satisfied.  See Gray v. Golden Gate Nat'l Recreational Area, 279 F.R.D. 501, 508 (N.D. Cal. 2011) (using U.S. Census data to infer that thousands of persons with mobility and/or vision disabilities visit defendant's park each year); Caltrans, 249 F.R.D at 347 (employing U.S. Census Data to find that numerosity was satisfied); Moeller v. Taco Bell Corp., 220 F.R.D. 604, 608 (N.D. Cal. 2004) (same); Access Now, Inc. v. Ambulatory Surgery Center Group, Ltd., 197 F.R.D. 522, 525 (S.D. Fla. 2000) (same); Arnold v. United Artists Theatre Circuit, Inc.,158 F.R.D. 439, 448 (N.D. Cal. 1994) (inferring from U.S. Census data that the number of wheelchair users and semi-ambulatory persons affected by alleged access barriers at theaters is in the thousands).

She points out that both of Defendant's witnesses agreed that it was reasonable to assume that thousands of people with mobility disability disorders visit Cracker Barrel's more than 600 stores each year. (Dorsey Dep. 130:14-131:6; Wilson Dep. 127:20-128:18.)  Defendant argues that Dorsey was responding to a question about "disabilities" in general, not limited to mobility disabilities and that Wilson said "We don't keep track of our customer base in that way, but I assume that yes, a large number of our guests have varying degrees of issues."  (Wilson Dep. at 127:5-17.)  However, when Wilson was asked whether it was reasonable to assume that thousands of people with mobility disabilities utilize accessible parking spaces at Cracker Barrel restaurants each year, she said "yes."

Commonality

With respect to commonality, Plaintiff argues that she has identified a uniform policy or practice that affects all class members, which "bridges the gap" between individual claims of

harm and the existence of a class of persons who have suffered the same injury.  Thorpe v. District of Columbia, 303 F.R.D. 120, 145-46 (D.D.C. 2014).  Plaintiff argues that she and the proposed class have been denied full and equal access to Defendant's stores because of Defendant's deficient ADA compliance policy, which permits its parking facilities to fall out of compliance with the ADA without detection.  All of Defendant's stores are purportedly assessed for potential ADA violations during what Defendant calls the "Unit Assessment Process," which is a biennial site inspection conducted at each of its locations.  Based on this inspection, if a facility manager determines that an ADA assessment is needed – a determination made, apparently, according to no cognizable standard whatsoever – all subsequent surveys and remediation projects are coordinated by one employee, Mr. Sherfy.  (Dorsey Dep. 50:18-51:3; 70:6-10.) Plaintiff argues that this centralized process consistently fails to identify ADA violations for multiple reasons.

First, Plaintiff notes that the employees who conduct these inspections have neither received the proper tools nor the proper training to identify ADA issues. (Dorsey Dep. 32:10-13.) Having no training upon which to rely, facility managers instead look for "obvious visibility issues, cracks, separations." (Dorsey Dep. 84:7-85:4; 88:21-24; 89:3-9.) Facility managers do not take "specific measurements."  (Dorsey Dep. 85:5-9; 89:6-9.) Thus, if there is a slope violation, facility managers must identify it with the naked eye. (Dorsey Dep. 89:3-19.)

In addition, Plaintiff argues that extensive surveys completed by both her investigators and Defendant's consultants show that Unit Assessment Process commonly fails to detect ADA violations.  For example, facility managers had used the Unit Assessment Process to inspect, on at least two or three prior occasions, the subject property at 200 Davis Boulevard that was visited by Plaintiff. (Wilson Dep. 101:22-107:24.) None of those inspections triggered any action by

Defendant, however, because Defendant's untrained employee did not note any ADA violations. After this lawsuit was filed, however, Defendant's third-party survey confirmed Plaintiff's assertions. Likewise, Defendant had not retained a third party consultant to survey five of the six other stores named in the Complaint prior to this lawsuit because it "had no knowledge at the time that something needed to be remediated." (Wilson Dep. 107:3-109:8; 115:20-116:24.) Ms. Wilson testified that, for all the locations in the complaint where Plaintiff alleged slope violations in either access aisles or accessible parking spaces, Defendant's own pre-remediation reports confirmed these violations and Defendant subsequently conducted remediation accordingly. (Wilson Dep. 118:1-12.)

Plaintiff also argues that, even when Defendant's employees determine that a comprehensive ADA inspection of a particular location is necessary, that process fails to remediate the violations found; sometimes including even the most obvious and basic violations. For instance, at Defendant's Knoxville, Tennessee location, a pre-ADA store, a Defendant-ordered ADA site survey on November 16, 2011 found, inter alia, no "van accessible signage" and no signage signifying spaces are accessible. (ECF No. 102 Vol. VI, App. 1333-36 (Buck survey of 9214 Park West Boulevard, Knoxville, Tennessee); Wilson Dep. 90:12-22.) More than three years later, on May 19, 2015, Plaintiff's investigators surveyed the same location and found that Defendant had failed to install the required signs. (Vol. IV, App. 1010-1016.) Even though Defendant's corporate designee testified that installing a sign in a parking lot is "a quick fix" and should be addressed promptly, it has taken Defendant nearly four years to simply install a sign. Wilson Dep. 44:8-45:21; 90:12-94:9. Thus, even when the Unit Assessment Process identifies ADA violations, Defendant fails to employ a reliable procedure to ensure that those violations are promptly remedied. Defendant responds that Plaintiff is pointing to two different spots in the

parking lot and that it did install a sign where one was first noticed as missing.

Plaintiff argues that courts have routinely certified classes where similarly deficient common policies have denied classes of individuals their most basic civil rights under the ADA. See, e.g., Thorpe, 303 F.R.D. at 146 (finding commonality satisfied where plaintiffs contend Defendant failed to implement an effective system for class members); Lane v. Kitzhaber, 283 F.R.D. 587, 598 (D. Or. 2012) (finding commonality satisfied where "lawsuit challenges a system-wide practice or policy that affects all members of a putative class."); Gray, 279 F.R.D. at 516 (finding common question of whether defendant has taken reasonable steps to comply with the Rehabilitation Act remedy access barriers"); Caltrans, 249 F.R.D. at 346 (certifying a class of individuals with disabilities challenging access barriers across the state of California because "[t]he question of [the defendant's] system-wide discriminatory practices [was] an issue common to all plaintiffs"); Lucas v. Kmart Corp., 2005 WL 1648182, at *1 (D. Colo. July 13, 2005) (certifying class of individuals with disabilities challenging access barriers across 1,500 locations because the defendant had "centralized policies and practices that created architectural and related barriers and impeded the ability of wheelchair-bound shoppers from using or enjoying access to Kmart"); Moeller, 220 F.R.D. at 608-14 (N.D. Cal. 2004) (certifying class of individuals with disabilities challenging barriers at approximately 220 restaurants and stating that the existence of "centralized decision-making is an additional factor weighing heavily towards a finding of commonality, if it does not establish commonality outright").

Defendant argues that these cases were brought under ADA Title II, not Title III. As explained above, this is a distinction without a difference: Title III requires public accommodations to become and remain compliant with ADA requirements and allows for modification of a policy as a form of injunctive relief, and the fact that Title II and Title III have

different regulations is of no moment because the Title II regulations are not privately enforceable. Thus, if courts can grant injunctions requiring public entities to modify their ongoing ADA compliance policies, there is no reason that such relief cannot be entered with respect to places of public accommodation under Title III.

Typicality

With respect to typicality, Plaintiff contends that she has claims typical of the class. Defendant contends that she is subject to unique defenses.

"The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." Baby Neal, 43 F.3d at 57. Defendant does not dispute that Plaintiff's claims differ from those of the proposed class. Rather, it argues that, because she is a "paid tester," she is subject to defenses not applicable to the proposed class members.

Defendant cites the Mielo case for the proposition that an ADA "tester" (someone who is a named plaintiff as opposed to someone who use or frequents an establishment solely to partake of goods or services there) is subject to "a unique, possibly disqualifying defense." 2015 WL 1299815, at *7 (citing CCDC, 765 F.3d at 1211). However, the CCDC case upon which Mielo relied actually held that:

> "testers have standing to sue under Title II of the ADA." We believe the same is true for Title III of the ADA. See Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1332-34 (11th Cir. 2013) (holding that testers have standing under Title III of ADA). Like Title II, Title III provides remedies for "any person" subjected to illegal disability discrimination. Compare 42 U.S.C. § 12133 (Title II), with id. § 12188(a)(1) (Title III). Thus, anyone who has suffered an invasion of the legal interest protected by Title III may have standing, regardless of his or her motivation in encountering that invasion.

CCDC, 765 F.3d at 1211 (quoting Tandy v. City of Wichita, 380 F.3d 1277, 1287 (10th Cir.

2004). See also Gordon v. Virtumundo, Inc., 575 F.3d 1040, 1069 (9th Cir. 2009) (plaintiff had standing regardless of motive for visiting public accommodation); Garner, 2013 WL 6731903, at *7 (same); Clark v. McDonald's Corp., 213 F.R.D. 198, 227-28 (D.N.J. 2003); Klaus v. Jonestown Bank and Trust Co., 2013 WL 4079946, at *7. As one court recently noted, "given the remedial purposes of Title III and the role assigned by Congress to private enforcement of its provisions, the benefit of the doubt as to standing should be accorded even to the 'tester' plaintiff." Marradi v. Galway House, Inc., 2014 WL 1454266, at *4 (D. Mass. Apr. 15, 2014).

Finally, Defendant challenges Plaintiff's adequacy, again referring to her as a "paid tester" and "in effect, a hired gun." (ECF No. 108 at 27.) As explained above, however, the weight of authority is to permit standing to a plaintiff who acts as a tester.[14] Moreover, as Plaintiff's testimony indicates, she has worked for years for various organizations to better the lives of individuals with disabilities. The implication that she visits Cracker Barrel restaurants solely to provide grist for a litigation mill and/or to make money is not borne out by the record. More importantly, it is still incumbent upon Defendant to ensure that its facilities comply with the ADA, regardless of the possible motive (or motives) of individuals who visit them.

Defendant does not contend that the law firm of Carlson, Lynch, Sweet & Kilpela could not adequately represent the proposed class. It is noted that this firm has considerable experience in litigating ADA Title III cases. Therefore, Plaintiff has demonstrated that she meets the Rule 23(a) requirements.

---

[14] In the Anderson case, Judge Hornak observed that the issue of whether a plaintiff may satisfy the intent to return requirement if she visits the establishment solely as a tester has not been addressed by the Third Circuit. 943 F. Supp. 2d at 542 n.12. He then cited cases on both sides of the issue of whether testers have standing. Id. However, it is noted that three courts of appeals and numerous district courts have concluded that testers have standing, while fewer (generally older) district courts cases have concluded that they do not.

<u>Rule 23(b) Application</u>

"Rule 23(b)(2) permits class actions for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class.' Civil rights cases against parties charged with unlawful, class-based discrimination are prime examples." <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591, 614 (1997). "Rule 23(b)(2) applies … when a single injunction or declaratory judgment would provide relief to each member of the class." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2557 (2011). As explained above, Plaintiff has proffered evidence that Defendant's policy of ADA compliance is ineffective and that it affects all members of the class. A single injunction would provide relief to each member of the class.

It is therefore recommended that Plaintiff's Motion be granted and that the following Class be certified:

> All persons with qualified mobility disabilities, who were denied the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any Cracker Barrel store location in the United States on the basis of disability because such persons encountered accessibility barriers due to Cracker Barrel's failure to comply with the ADA's accessible parking and path of travel requirements.

It is further recommended that Sarah Heinzl be appointed as the representative Plaintiff for this Class and that the law firm Carlson Lynch Sweet & Kilpela, LLP be appointed as counsel for the Class.

<u>Summary Judgment Standard of Review</u>

As amended effective December 1, 2010, the Federal Rules of Civil Procedure provide that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Summary judgment may be granted against a party who fails to adduce facts

sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In following this directive, a court must take the facts in the light most favorable to the non-moving party, and must draw all reasonable inferences and resolve all doubts in that party's favor. Hugh v. Butler County Family YMCA, 418 F.3d 265, 266 (3d Cir. 2005); Doe v. County of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

Defendant argues that: 1) this case is moot now that the seven stores identified in the Complaint have been remediated; 2) Plaintiff cannot bring a class action for a moot case; 3) Plaintiff lacks standing because the stores have been remediated; 4) no exception to mootness exists; and 5) Plaintiff cannot recover attorney's fees because she is not a prevailing party and the Supreme Court has rejected awarding attorney's fees under the catalyst theory pursuant to the ADA.

Plaintiff responds that: 1) this case is not moot because Defendant does not meet the standards for the voluntary cessation doctrine; 2) she is challenging the policy of Defendant's ADA compliance, which remains in place even after the seven stores identified in the Complaint have been remediated; and 3) there is no evidence that the stores will remain ADA compliant,

given that facility managers are not trained in ADA compliance, that Defendant identified only 29 stores when Plaintiff's investigators identified 107, and that Defendant admits that weather and other factors can cause parking lots to fall out of compliance.

In its reply brief, Defendant argues that: 1) Plaintiff originally challenged the architectural barriers at seven stores, so now that they have been fixed she has changed course and contends that, at some hypothetical time in the future they will become non-compliant but that does not demonstrate an exception to mootness; 2) Plaintiff relies upon cases in which a company's practice which violates the ADA (for example, disallowing service dogs) could recur, but that is not the situation presented here; and 3) even applying that standard, Defendant would meet it because Cracker Barrel has long had an ADA compliance policy, it inaugurated a plan to make stores complaint in 2012 (before this case was filed) and hired consultants to make this possible, and it has admitted its prior non-compliance by fixing the stores Plaintiff identified in the Complaint.

Mootness

Defendant argues that this case is moot because it has remediated the parking lots at the seven stores identified in the Complaint and no exception to the mootness doctrine applies. Plaintiff responds that the proper analysis is that of voluntary cessation, which Defendant has not demonstrated.

The Court of Appeals has held that:

Under Article III, section 2 of the U.S. Constitution, federal judicial power extends only to cases or controversies. If a claim does not present a live case or controversy, the claim is moot, and a federal court lacks jurisdiction to hear it. See United States Parole Comm'n v. Geraghty, 445 U.S. 388, 396-97, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). As the United States points out, voluntary cessation does not automatically render the case moot. In Friends of the Earth, Inc., v. Laidlaw Environmental Services, 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), the Supreme Court held that "it is well settled that 'a defendant's

> voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice' " (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)). The standard for "determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Id. (citing United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)). Moreover, the party alleging mootness bears the "heavy," even "formidable" burden of persuading the court that the challenged conduct cannot reasonably be expected to resume. Id. at 189-90, 120 S.Ct. 693.

United States v. Government of Virgin Islands, 363 F.3d 276, 284-85 (3d Cir. 2004) (footnote omitted).

In order to demonstrate that the voluntary cessation doctrine applies, Defendant must show that: 1) the challenged conduct was isolated rather than continuing; 2) it has had a change of heart and did not simply fix the problem in response to a lawsuit; and 3) it has acknowledged responsibility. Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1184 (11th Cir. 2007) (citing Laidlaw, 528 U.S. at 189). See DeJohn v. Temple Univ., 537 F.3d 301, 311 (3d Cir. 2008) (defendant's refusal to change its policy for more than a year after suit was filed and just before motions were due, and its continued defense of former policy were relevant factors in evaluating that there was a "reasonable expectation" that it would reimplement the policy); Sawczyn, 8 F. Supp. 3d at 1114 (even accepting bank's assertion that its ATMs were now ADA compliant, the fact that they were not prior to suit being brought was relevant both with respect to the issue of whether bank's compliance was voluntary and also with respect to the issue of whether bank's procedures were effective when violations went unnoticed and unrepaired for eighteen months); McDonald's, 2013 WL 6408650, at *6-7 (McDonald's act of fixing violations after the filing of a complaint, which showed a history of passive indifference, did not eliminate the possibility of future violations when the requirements of the ADA had been well publicized

for many years).

Plaintiff argues that Defendant cannot meet any of these factors: 1) the policy of inadequate ADA review is continuing; 2) Defendant admits that it remediated the seven stores in response to a lawsuit and it has stated that it has no intention of changing its inadequate compliance policy; and 3) it has not acknowledged responsibility. Defendant argues that it has an ADA compliance policy, but it is that policy which Plaintiff is challenging herein. It contends that it began to check its stores in 2012, before this case was filed, but its witnesses admitted that the seven stores identified in the Complaint were remediated in response to this lawsuit and its ADA compliance policy failed to identify numerous non-compliant stores that Plaintiff subsequently identified. Finally, it argues that it has acknowledged responsibility by remediating the seven stores identified in the Complaint, but its responses to discovery explicitly deny responsibility.

In the case (cited by Defendant) in which the Supreme Court held that a plaintiff whose lawsuit caused a defendant to voluntarily change its conduct is not a "prevailing party" for purposes of receiving attorney's fees under the ADA, the Court stated that, even in a case that is brought solely for equitable relief:

> it is not clear how often courts will find a case mooted: "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (internal quotation marks and citations omitted). If a case is not found to be moot, and the plaintiff later procures an enforceable judgment, the court may of course award attorney's fees. Given this possibility, a defendant has a strong incentive to enter a settlement agreement, where it can negotiate attorney's fees and costs. Cf. Marek v. Chesny, 473 U.S., at 7, 105 S.Ct. 3012 ("[M]any a defendant would be unwilling to make a binding settlement offer on terms that left it exposed to liability for attorney's fees in whatever amount the court might fix on motion of the plaintiff" (internal quotation marks and citation omitted)).

Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Res., 532 U.S. 598, 609 (2001).

Defendant cites the Thomas case, in which the court held that, once a bank brought its non-complying ATMs into ADA compliance, the case was moot. In that case, however, the court observed that:

> Thomas does not aver that once-compliant ATMs have fallen into noncompliance. That is, this case contains no allegations or evidence that BB & T has failed to keep its ATMs in compliance. This case is solely about BB & T's failure to timely implement one-time modifications to its ATMs after the promulgation of the 2010 ADA standards.
>
> If, hypothetically, Thomas brought allegations that BB & T failed to perform proper maintenance on its ATMs, the result here might be different. If BB & T's ATMs seesawed between compliance and noncompliance, there would be a reasonable expectation of recurrence, which would likely suffice to defeat a mootness challenge. Alternatively, that type of repetitive injury could be classified as one not capable of judicial review that could not be mooted by voluntary cessation. See generally L.C. by Zimring v. Olmstead, 138 F.3d 893, 895 n. 2 (11th Cir. 1998), aff'd in part, vacated in part sub nom., Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). But no such allegations exist here.

32 F. Supp. 2d at 1271.

In this case, by contrast, Plaintiff has alleged and proffered evidence that Cracker Barrel's supposedly compliant parking lots have fallen out of compliance. Moreover, Plaintiff has proffered evidence that Cracker Barrel's ADA compliance policy has missed numerous stores that were out of compliance. See Moore v. Dollar Tree Stores, Inc., 85 F. Supp. 3d 1176, 1187-88 (E.D. Cal. 2015) (even after defendant fixed the operational pressure of exterior doors, evidence was disputed as to whether they reasonably could be expected to lapse into noncompliance).

Defendant has not demonstrated that it has met the requirements of the voluntary

cessation doctrine.  In addition, even if the voluntary cessation doctrine did not apply, there are

four exceptions to the general defense of mootness:

> (1) secondary or "collateral" injuries survive after resolution of the primary
> injury; (2) the issue is deemed a wrong capable of repetition yet evading review;
> (3) the defendant voluntarily ceases an allegedly illegal practice but is free to
> resume it at any time; or (4) it is a properly certified class action suit.

Chong v. District Director, I.N.S., 264 F.3d 378, 384 (3d Cir. 2001).  As noted above,

Defendant's approach to the ADA appears to be of the "capable of repetition yet evading

review" variety: it remediates individual stores when sued for ADA violations, then moves to

dismiss the case as moot.  Moreover, if the practice is the non-compliant ADA policy rather than

the architectural barriers at individual stores, then the practice is ongoing and Defendant is free

to resume it any time.  Finally, as explained herein, the case should be certified as a class action

and thus three of the four exceptions to mootness would be met.

Defendant also argues that Plaintiff lacks standing now that the seven stores named in the

Complaint have been remediated.  This argument is discussed above.

For all the reasons cited above, it is recommended that the motion to certify class filed on

behalf of the plaintiff and as defined above (ECF No. 103) be granted.  It is further

recommended that the motion for summary judgment filed on behalf of the defendant (ECF No.

64) be denied.

Litigants who seek to challenge this Report and Recommendation must seek review by

the district judge by filing objections by February 10, 2016.  Any party opposing the objections

shall file a response by February 24, 2016.  Failure to file timely objections will waive the right

of appeal.

s/Robert C. Mitchell

ROBERT C. MITCHELL

United States Magistrate Judge

Date: January 27, 2016